No. 14-5018

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

THE HOPI TRIBE,
*A Federally Recognized Tribe*

Plaintiff/Appellant,

v.

THE UNITED STATES OF AMERICA

Defendant/Appellee

Appeal from the United States Court of Federal Claims
Case No. 12-45 L
The Honorable Lawrence J. Block, Judge Presiding

## BRIEF AND REQUIRED ADDENDUM OF
## PLAINTIFF/APPELLANT THE HOPI TRIBE

Michael D. Goodstein
HUNSUCKER GOODSTEIN PC
5335 Wisconsin Avenue NW
Suite 360
Washington, DC 20015
Ph: (202) 895-5380
Fax: (202) 895-5390

*Attorneys for Plaintiff/Appellant*
*The Hopi Tribe*

ORAL ARGUMENT REQUESTED

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

The Hopi Tribe v. The United States of America
No. 14-5018

## CERTIFICATE OF INTEREST

Counsel for the appellant, The Hopi Tribe, certifies the following:

1. The full name of every party or amicus represented by me is:
   __The Hopi Tribe_____
   _____
   _____

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:
   __The Hopi Tribe_____
   _____
   _____

3. All parent corporations and any publicly held companies that own 10 percent or more
   of the stock of the party or amicus curiae represented by me are:
   __None_____
   _____
   _____

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:
   __Michael D. Goodstein_____ _____
   __HUNSUCKER GOODSTEIN PC_____

Date February 21, 2014          /s/ Michael D. Goodstein_____
                                Signature of counsel

                                Michael D. Goodstein
                                Counsel for Plaintiff/Appellant

i

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ...................................................................i

TABLE OF CONTENTS ...........................................................................ii

TABLE OF AUTHORITIES ....................................................................iv

STATEMENT OF RELATED CASES ....................................................... 1

JURISDICTIONAL STATEMENT ........................................................... 2

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW .............. 4

STATEMENT OF THE CASE ................................................................... 5

STATEMENT OF THE FACTS ................................................................. 8

SUMMARY OF THE ARGUMENT ....................................................... 15

ARGUMENT ........................................................................................... 18

I.      Standard of Review ...................................................................... 24

II.     The Court of Federal Claims Erred in Failing to Recognize that the Act of 1958 Includes a Reservation of Water Adequate in Quantity and Quality Sufficient to Fulfill the Purposes of the Hopi Reservation. .................................................................................. 26

        A.      The *Winters* Doctrine Establishes that "Land" Reservations Include Water. ................................................................... 29

        B.      "Land" and "Trust" in the Act of 1958 Must Include the Established Common Law Definitions of those Terms. ....... 33

        C.      The United States' Argument that It Has No Obligation to Protect the Drinking Water Resources of the Hopi Tribe Because the Act of 1958 Created a "Bare" or "Limited" Trust Must Be Rejected. ................................................................. 38

        D.      The Hopi Tribe Alleged a Breach of the Trust Obligations Arising from the Act of 1958. ............................................... 42

III.    The United States, as Trustee, Is Obligated to Protect the Drinking Water Resources of the Hopi Tribe as Part of the Trust Corpus. ......................................................................................... 42

        A.      The United States' Actions Must Be Considered in Determining the Scope of Its Duty. ..................................... 43

B.      The United States Has Exercised Extensive Control of the Hopi Tribe's Water Resources Pursuant to a Wide Network of Statutes and Regulations. ................................................. 47

IV.    The Laws Governing the United States' Construction and Operation of Hopi Drinking Water Systems Can Be Read Fairly as Mandating Compensation. ............................................................ 52

V.     The Damages Suffered by the Hopi Tribe as a Result of the United States' Failure to Properly Design and Install the Drinking Water Wells on the Hopi Reservation Provides Jurisdiction to the Court of Federal Claims Pursuant to the Indian Tucker Act. ................. 54

CONCLUSION ......................................................................... 56

PROOF OF SERVICE ................................................................ 58

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS ..................................................................... 58

REQUIRED ADDENDUM ........................................................... 59

# TABLE OF AUTHORITIES

## Cases

*Arizona v. California,*
   373 U.S. 546 (1963)..........................................................................15, 30

*Arizona v. California,*
   463 U.S. 545 (1983)..................................................................................15

*Arizona v. California,*
   466 U.S. 144 (1984)..................................................................................15

*Arizona v. San Carlos Apache Tribe of Arizona,*
   463 U.S. 545 (1983)............................................................................30, 31

*Cappaert v. United States,*
   426 U.S. 128 (1976)............................................................................9, 30

*Cobel v. Norton,*
   240 F.3d 1081 (D.C. Cir. 2001)..............................................................34

*FAA v. Cooper,*
   --- U.S. ---, 132 S. Ct. 1441 (2012) ..................................................20, 35

*Fletcher v. United States,*
   730 F.3d 1206 (10th Cir. 2013)........................................................20, 35

*Fort Mojave Indian Tribe v. United States,*
   23 Cl. Ct. 417 (1991) ..............................................27, 38, 39, 42, 46, 52

*Hamlet v. United States,*
   873 F.2d 1414 (Fed. Cir. 1989)..............................................................25

*In re the General Adjudication of All Rights to Use Water in the Gila River System and Source,*
   201 Ariz. 307 (Ariz. 2001) (en banc).....................................................32

*Midlantic National Bank v. New Jersey Department of Environmental Protection,*
   474 U.S. 494 (1986)........................................................................19, 33

*Molzof v. United States,*
  502 U.S. 301 (1992) ......................................................20, 35

*Moran v. Prather,*
  90 U.S. 492 (1874) ................................................................35

*New Mexico v. Aamodt,*
  537 F.2d 1102 (10th Cir. 1976) ...........................................33

*New Mexico v. Aamodt,*
  618 F. Supp. 993 (D.N.M. 1985) ..........................................36

*Pixton v. B&B Plastics, Inc.,*
  291 F.3d 1324 (Fed. Cir. 2002) ...........................................25

*Reynolds v. Army and Air Force Exchange Service,*
  846 F.3d 746 (Fed. Cir. 1988) .......................................25, 47

*Sekhar v. United States,*
  --- U.S. ---, 133 S. Ct. 2720 (2013) .....................................35

*Travelers Indem. Co. v. United States,*
  72 Fed. Cl. 56 (2006) ............................................................25

*United States v. Gila Valley Irrigation District,*
  920 F. Supp. 1444 (D. Ariz. 1996) ......................................31

*United States v. Gila Valley Irrigation District,*
  117 F.3d 425 (9th Cir. 1997) ...............................................31

*United States v. Jicarilla Apache Nation,*
  --- U.S. ---, 131 S. Ct. 2313 (2011) ...........20, 28, 34, 35, 38, 40

*United States v. Mitchell,*
  463 U.S. 206 (1983) ..................................................... passim

*United States v. Navajo Nation,*
  537 U.S. 488 (2003) .............................16, 18, 19, 23,26, 29, 42, 45, 52

*United States v. Navajo Nation,*
  566 U.S. 287 (2009) .......................................................23, 53

*United States v. Washington,*
  157 F.3d 630 (9th Cir. 1998) ...............................................24

*United States v. White Mountain Apache Tribe,*
   537 U.S. 465 (2003)..................................................................passim

*Wilson ex rel. Estate of Wilson v. United States,*
   405 F.3d 1002 (Fed. Cir. 2005) ...........................................24

*Winters v. United States,*
   207 U.S. 564 (1908)....................................8, 9, 15, 29, 30, 31

## Statutes

25 U.S.C. § 13 ..............................................................................51

25 U.S.C. § 162a(d)(8)..................................................................44

25 U.S.C. § 1632............................................................................41

25 U.S.C. § 631..............................................................................51

25 U.S.C. § 638..............................................................................51

28 U.S.C. § 1295(a)(3).....................................................................3

28 U.S.C. § 1491(a)(1)..................................2, 4, 5, 16, 18, 54

28 U.S.C. § 1505..........................................2, 4, 5, 16, 17, 18, 54

42 U.S.C. § 2004a(a)(1)................................................................51

## Regulations

40 C.F.R. § 141.6(j) ......................................................................13

## Rules

Federal Circuit Rule 28(a)(12) ........................................................2

Federal Circuit Rule 30(a)(4) ..........................................................2

Federal Rule of Appellate Procedure 3(a) ....................................3

Federal Rule of Appellate Procedure 4(a)(1)(B) ..........................3

U.S. Court of Federal Claims Rule 20(c) ..................................................... 7

## **Other**

Pub. L. No. 85-547, 72 Stat. 403 (1958) ............................... 6, 8, 21, 26, 36

Pub. L. No. 89-121, 42 U.S.C. §§ 2001-2004 ............................................ 11

Cohen's Handbook of Federal Indian Law § 5.05[2] (2005 ed.) ........ 44, 45

## STATEMENT OF RELATED CASES

There are no known related cases pending in this or any other court that may directly affect or be directly affected by this court's decision in the pending appeal.

# JURISDICTIONAL STATEMENT

The Hopi Tribe filed its complaint against the United States pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1), and the Indian Tucker Act, 28 U.S.C. § 1505, in the Court of Federal Claims on January 20, 2012. A10.[1] The Tribe alleged that "the United States is under an obligation to provide the Hopi Tribe with sufficient water to fulfill the purpose of the Reservation," A10 ¶ 2, that the United States has not met its obligation given exceedences of arsenic above the national maximum contaminant level ("MCL") for drinking water serving certain Hopi Villages on the eastern part of the reservation, A10 ¶ 3, and that as a result "the Tribe has and will suffer damages, including but not limited to costs expended to provide the Affected Villages with an alternative water supply," A10 ¶ 4.

The United States contested the Court of Federal Claims' jurisdiction in a motion to dismiss the complaint. A17. On October 4, 2013, the Court of Federal Claims granted the United States' motion,

---

[1] Citations to "A___" are to the Required Addendum and Appendix. The Required Addendum is attached, per Federal Circuit Rule 28(a)(12). The Hopi Tribe will file the complete Appendix in accordance with Federal Circuit Rule 30(a)(4), with pagination consecutive with the Required Addendum.

A2, and entered a final judgment against the Hopi Tribe, A1. The Court of Federal Claims' order and judgment disposed of all parties' claims. On November 18, 2013 the Hopi Tribe filed a timely notice of appeal with this Court. *See* Fed. R. App. P. 3(a) & 4(a)(1)(B).

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(3) from the final order and judgment of the Court of Federal Claims.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1. Does the Act of 1958, ratifying an 1882 Executive Order and establishing the Hopi Reservation, include an implied reservation of water adequate in quantity and quality to fulfill the purposes of the Hopi Reservation pursuant to the federal reserved water rights doctrine?

2. Is the United States, as trustee, obligated to protect the drinking water resources of the Tribe as part of the trust *res*, when the United States has played a central role in determining where and how access to water would be secured for the Tribe including designing and installing the affected groundwater wells?

3. Do the damages suffered by the Hopi Tribe as a result of the United States' failure to properly design and install the wells so as to deliver potable drinking water to the Tribe provide jurisdiction to the Court of Federal Claims pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1), and the Indian Tucker Act, 28 U.S.C. § 1505?

4

## STATEMENT OF THE CASE

The Hopi Tribe filed its complaint against the United States pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1), and the Indian Tucker Act, 28 U.S.C. § 1505, in the Court of Federal Claims on January 20, 2012. A10. The Tribe alleged that "the United States is under an obligation to provide the Hopi Tribe with sufficient water to fulfill the purpose of the Reservation," A10 ¶ 2, that the United States has not met its obligation given exceedences of maximum contaminant levels for arsenic in certain drinking water systems for Hopi Villages on the eastern part of the reservation, A10 ¶ 3, and that as a result "the Hopi Tribe has and will suffer damages, including but not limited to costs expended to provide the Affected Villages with an alternative water supply," A10 ¶ 4.

The United States filed a motion to dismiss the complaint for lack of subject matter jurisdiction on January 4, 2013. A17. The United States argued that it has no fiduciary duty to improve the water supply systems on the Hopi Reservation or to remedy the excessive arsenic levels currently present in Hopi drinking water. *See* A17-18.

The Hopi Tribe responded that "[t]he *Winters* Doctrine provides that along with the land, the United States also reserved sufficient water to fulfill the purpose of the Reservation."  A49.  The Tribe further argued that "[u]nder the *Winters* Doctrine, the Hopi Tribe has a right to a sufficient amount of water to support the Reservation as a permanent homeland for the Hopi People," including surface and groundwater as well as quantity and quality.  A49-50.  The Hopi Tribe also argued that the United States' pervasive role in managing the Hopi Tribe's drinking water resources informs the scope of the United States' trust duties:

> The role that United States plays with respect to Hopi water resources is far greater than a general trust relationship. The United States is involved in every aspect of the Hopi Tribe's access to water: reserving the homeland for the Hopi Tribe through the 1882 Executive Order as ratified by the Act of July 22, 1958, Pub. L. No. 85-547, 72 Stat. 403 (1958) – which includes reservation of sufficient water to support that homeland; representing the interests of the Hopi Tribe for more than three decades in water rights disputes; operating one of the largest water system on Hopi Tribal lands; locating, designing, funding, installing and owning groundwater wells in the communities of Mishongnovi, Polacca, Sipaulovi, Shungopavi, and Keams Canyon, which are the villages affected by elevated levels of arsenic in their drinking water; operating federal facilities on the Hopi Reservation that rely solely on the water at issue in this case; as well as prescribing the standards for determining whether water from these wells may be safely consumed.

A37.

6

The Hopi Tribe requested, alternatively, that jurisdictional discovery be allowed to permit the Tribe an opportunity to obtain and present records about the Hopi Tribe's groundwater wells and systems that are still maintained by and in the possession of the United States. A69-71. The Court of Federal Claims denied the Hopi Tribe's request for jurisdictional discovery. A9.

Pursuant to Rule 20(c) of the United States Court of Federal Claims, the Hopi Tribe also requested oral argument on the United States' motion. A71. No oral argument was scheduled.

The Court of Federal Claims identified the "central legal question in this case" as "the precise scope of the federal government's duties as trustee with respect to Indian trusts." A2. The Court also recognized that the United States' trust duties are determined by "closely examining the statutes that impose them," A6 (citing cases), and that "the federal government's trust duties are ultimately determined by Congress," *id.* (citing cases). The Court of Federal Claims, however, did not consider (or even mention) the *Winters* Doctrine or other pertinent canons of construction in determining whether the terms of the Act of

1958 included a fiduciary duty to provide adequate drinking to the Hopi Tribe.

## STATEMENT OF THE FACTS

President Chester A. Arthur established the Hopi Reservation by executive order on December 16, 1882.  A12 ¶ 12.  The 1882 Executive Order was intended to establish a reservation as "permanent homeland for the use and occupancy of the Hopi Tribe."  A14 ¶ 27; A12 ¶ 13.  The Hopi Reservation was recognized and confirmed by Congress in 1958.  Pub. L. No. 85-547, 72 Stat. 403 (1958) (the "Act of 1958"); A12 ¶ 12.  *See also* A22.  The Act of 1958 provides:

> That lands described in the Executive order dated December 16, 1882, are hereby declared to be *held by the United States in trust* for the Hopi Indians and such other Indians, if any, as heretofore have been settled thereon by the Secretary of the Interior pursuant to such Executive order.

Public Law 85-547, Sec. 1 (emphasis added).

Congress passed the Act of 1958 against the backdrop of several key Supreme Court decisions on Indian Law.  One such landmark case was *Winters v. United States*, 207 U.S. 564 (1908).  That suit was filed by the United States on behalf of the Indians on the Fort Belknap Indian Reservation to restrain the construction of dams on the Milk

River in Montana. *Id.* at 565. The United States had "alleged with detail" that "it is essential and necessary that all of the waters of the river flow down the channel uninterruptedly and undiminished in quantity and underteriorated in quality." *Id.* at 567. The United States Supreme Court agreed and held that "it cannot be supposed that the Indians were alert to exclude by formal words every inference which might militate against or defeat the declared purpose of themselves and the government, even if it could be supposed that they had the intelligence to foresee the 'double sense' which might some time be urged against them." *Id.* at 577. The resulting "*Winters* Doctrine"— that "when the Federal Government withdraws its land from the public domain and reserves it for a federal purpose, the Government, by implication, reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation"—has been universally applied since that decision. *See Cappaert v. United States*, 426 U.S. 128, 138 (1976). The Act of 1958 was passed against the backdrop of the *Winters* Doctrine.

The United States has argued in this case that the *Winters* Doctrine gives "*the United States*," the right to the reserved water, "on

behalf of an Indian tribe." A22 (emphasis added). The history of United States' actions in controlling the Hopi Tribe's water rights is consistent with this view. The United States has designed, installed, constructed, and maintained the affected water systems on the Hopi Reservation. The United States is a major water user on the Hopi Reservation. And the United States represents the Hopi Tribe in water adjudications setting the extent of the reserved water right.

As trustee, the United States has exercised control over the Hopi Tribe's water supplies that were reserved in the Act of 1958 pursuant to the *Winters* Doctrine. The United States located, designed, installed, and owned the wells serving the villages of Mishongnovi, A77 ¶ 6 & A111-17, Polacca, A77 ¶¶ 7-8 & A118-33; A319-20 ¶¶ 4-8, Sipaulovi, A77 ¶¶ 6, 9 & A111-17; A134-38, Shungopavi and Keams Canyon, A77 ¶ 11 & A144-48. *See also* A76-77 ¶¶ 4-5. The U.S. Bureau of Indian Affairs ("BIA") designed and installed the Second Mesa Day School Well #2 and the Keams Canyon Well #2. A77 ¶ 10 & A141-43; A77 ¶ 11 & A146-48. The IHS oversaw the drilling of Mishongnovi-Sipaulovi Well #1, A77 ¶ 6 & A113-16, and DOI appears to have installed Lower Sipaulovi Well #1, A77 ¶ 9 & A136-38. The U.S. Public Health Service

10

constructed Polacca Wells #5 and #6 pursuant to P.L. 86-121, 42 U.S.C. §§ 2001-2004.  A77 ¶¶ 7-8 & A120-21, A126-27.  Indeed, most of the arsenic-contaminated wells were installed before the Hopi Tribe performed such functions.  A78 ¶ 13.

The United States selected and hired the contractors to construct the contaminated wells.  *See, e.g.*, A320 ¶¶ 7-8.  The United States listed itself as the "owner" of the affected wells.  BIA owns and operates the Keams Canyon water system.  A77-78 ¶ 12, A179 ¶ 185 & A240. The U.S. Public Health Service was listed as the owner of Lower Sipaulovi Well #1 at the time it was installed by the U.S. Department of Interior ("DOI").  A136.  The U.S. Public Health Service is listed as the "owner" and IHS as "customer" for Polacca Well #5 and Polacca Well #6. A120; A122; A126; A128.  The U.S. Indian Health Services ("IHS") is the "Name of Person to Contact" for the drillers log and water quality analysis or the "customer" on records for Mishongnovi-Sipaulovi Well #1.  A114; A117.

The United States also designated itself as the record keeper for those wells.  For example, the United States has maintained the records for at least Mishongnovi-Sipaulovi Well #1, A114, and the records for

the installation and construction of Lower Sipaulovi Well #1, A136-38. The BIA Branch of Plant Design and Construction also maintained well records for the Second Mesa Day School, A141-43, and Keams Canyon, A146-48.

The United States uses water from the affected wells at various schools that it owns and operates, as well as at other IHS facilities. *See* A76 ¶ 4 & A110 (Keams Canyon system); A78 ¶ 14 (Polacca system); A319-20 ¶¶ 4-8 (same). The U.S. Bureau of Indian Education ("BIE") similarly owns and operates several schools on the Hopi Reservation that rely solely on the Affected Villages' water systems. *See* A77-78 ¶ 12, A157 ¶ 16 & A238. The Keams Canyon water system, owned and operated by BIA, provides water service to a BIA boarding school, police station, and IHS office buildings. A77-78 ¶ 12, A179 ¶ 185 & A240-41; A76 ¶ 4 & A110.

Not only has the United States dictated where and how water supply systems will be developed on the Hopi Reservation, but, for over thirty years, the United States has represented the Hopi Tribe in ongoing water rights adjudications and negotiations. A25. The United States acknowledges that it has "claimed water rights on behalf of the

12

Hopi Tribe in the ongoing Little Colorado River Adjudication in Northern Arizona." A22.

Thus the United States has taken a very active role as the trustee over the Hopi Tribe's water resources, including not just protection of the right to such water through representation of the Tribe in water rights proceedings, but also provision of drinking water through development, construction, and maintenance of supply systems, including those with unsafe arsenic levels.

The United States has promulgated drinking water regulations that establish the maximum contaminant level ("MCL") for certain chemicals, including arsenic, allowed in water meant for human consumption. *See* A12 ¶ 15. Effective January 23, 2006, the United States lowered the MCL for arsenic to 10 µg/L. *See* A12 ¶ 16; 40 C.F.R. § 141.6(j). For comparison, a report prepared for the U.S. Environmental Protection Agency reports that the source water for the Keams Canyon system has arsenic levels in the 35-45 µg/L range. A88. The water systems serving Mishongnovi, Polacca, Sipaulovi, Shungopavi, and BIA Keams Canyon (the "Affected Villages") has

consistently contained arsenic at levels exceeding the MCL. A12-13 ¶¶ 17-18; *see also* A191 ¶¶ 308-10; A87.

Arsenic harms the central and peripheral nervous systems and the heart and blood vessels. A13 ¶ 19. It causes serious skin problems. *Id.* Prolonged exposure causes bladder, lung and skin cancer, and may cause kidney and liver cancer. *Id.* Water with arsenic levels over the MCL has been found by the United States to be unfit for human consumption, A12 ¶¶ 15-16, but, for people living in the Affected Villages, there is no other source of drinking water available, A13 ¶ 20.

The United States has alleged that arsenic is naturally occurring in certain parts of the aquifer servicing the eastern part of the Reservation. A17. This indicates that the arsenic levels in these systems have always been unsafe. But it is only since 2006 that the water supplies have exceeded the MCL for arsenic, putting these systems out of compliance with U.S. regulations.

## SUMMARY OF THE ARGUMENT

The Court of Federal Claims' failure to acknowledge that in the creation of the Hopi Reservation, along with the land, the United States also reserved sufficient water to fulfill the purpose of the Reservation, *Winters*, 207 U.S. at 576-77, "without which their lands would have been useless," *Arizona v. California*, 373 U.S. 546, 600 (1963), as amended by 463 U.S. 545 (1983) and 466 U.S. 144 (1984), is inconsistent with United States Supreme Court precedents and thus reversible error. The 1882 Executive Order and the Act of 1958, when read in accordance with binding canons of interpretation, including the *Winters* Doctrine, and coupled with the United States actual extensive involvement in and control over the Hopi Tribe's water resources, creates a trust relationship between the United States and the Hopi Tribe with respect to Hopi water resources.

The question at issue in this appeal is whether the Court of Federal Claims has jurisdiction to hear the Tribe's claim for damages arising out of the United States' breach of its trust obligations to provide adequate quantity and quality of water to sustain the Hopi Reservation as a permanent homeland for the Hopi Tribe. Jurisdiction

is vested in the claims court for "any claim against the United States founded either upon the Constitution, or any act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated damages in cases not sounding in tort." 28 U.S.C. §§ 1491(a)(1) & 1505. Courts have consistently applied a two-step framework for determining whether there is jurisdiction under the Indian Tucker Act: First, there must be a substantive source of law establishing the trust obligations that are alleged to have been breached. Second, that substantive law must be able to be fairly interpreted as mandating compensation. *See United States v. Mitchell ("Mitchell II")*, 463 U.S. 206, 217 (1983); *United States v. Navajo Nation ("Navajo I")*, 537 U.S. 488, 489-90 (2003). Once a fiduciary obligation is found in the first step, however, it "naturally follows that the Government should be liable in damages for the breach of its fiduciary duties." *Mitchell II*, 463 U.S. at 226.

As explained further below, "lands" in the Act of 1958 must be read as "lands and waters" pursuant to the *Winters* Doctrine and relevant canons of statutory construction. Moreover, the United States' extensive control over the Hopi Tribe's water resources, pursuant to a

network of statutory authorities and directives, further establishes the scope of the United States' trust obligations to the Tribe. Importantly, the trust relationship between the parties need not be all-encompassing for purposes of this case; it simply must include the obligation to ensure adequate quality of water to sustain the Hopi Reservation as a permanent homeland for the Hopi Tribe. As set forth below, the United States owes such a duty to the Hopi Tribe, and, as trustee, is obligated to ensure that the drinking water systems that it developed and installed, and which are an important part of the trust corpus, provide water fit for human consumption. The damages suffered by the Hopi Tribe from the United States' breach of this duty include the cost of providing temporary and permanent alternative sources of drinking water to the affected villages, and give rise to jurisdiction in the Court of Federal Claims pursuant to the Indian Tucker Act, 28 U.S.C. § 1505.

## ARGUMENT

The Court of Federal Claims has jurisdiction to resolve "any claim against the United States founded either upon the Constitution, or any act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (The Tucker Act); 28 U.S.C. § 1505 (The Indian Tucker Act). "[B]y giving the Court of Claims jurisdiction over specified types of claims against the United States, the Tucker Act constitutes a waiver of sovereign immunity with respect to those claims." *Mitchell II*, 463 U.S. at 212. The purpose of the Indian Tucker Act is to ensure that tribes have "'their fair day in court so that they can call the various Government agencies to account on the obligations that the Federal government assumed.'" *Id.* at 214 (quoting 92 Cong. Rec. 5312 (1946)).

Jurisdiction under the Indian Tucker Act and *Mitchell II*, 463 U.S. 206 (1983), requires a two-part analysis:

> (1) The claimant "must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties." *Navajo I*, 537 U.S. at 506.

18

(2) "[T]he court must determine whether the relevant source of substantive law 'can fairly be interpreted as mandating compensation for damages sustained as a result of a breach of the duties [the governing law] impose[s]." *Id.* (quoting *Mitchell II*, 463 U.S. at 219) (alteration original).

"Because the Tucker Act supplies a waiver of immunity for claims of this nature, the separate statutes and regulations need not provide a second waiver of sovereign immunity, nor need they be construed in the manner appropriate to waivers of sovereign immunity." *Mitchell II*, 463 U.S. at 218-19.

The first step in the *Mitchell II* analysis requires an evaluation of the Congressional act giving rise to the trust duty of the United States. In interpreting the underlying law, the Court must apply standard rules of statutory construction. This includes the maxim that Congress legislates against the backdrop of the common law, and if it "intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific." *Midlantic Nat'l Bank v. N.J. Dep't of Envt'l Protection*, 474 U.S. 494, 501 (1986) (internal citation omitted). Congress did nothing to indicate any intent to abrogate the *Winters* Doctrine in the Act of 1958, and so it must be incorporated.

The Court may also look to "traditional trust principles when those principles are consistent with the statute and help illuminate its meaning." *Fletcher v. United States*, 730 F.3d 1206, 1210 (10th Cir. 2013) (relying on *United States v. Jicarilla Apache Nation*, --- U.S. ---, 131 S. Ct. 2313 (2011)). Terms of art must be invested with "the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken." *FAA v. Cooper*, --- U.S. ---, 132 S. Ct. 1441, 1449 (2012) (quoting *Molzof v. United States*, 502 U.S. 301, 307 (1992)). "Trust" is a term of art, and so the Act of 1958 must be read accordingly to support the Hopi Tribe's "fair inference that an obligation to preserve the [trust corpus] was incumbent on the United States as trustee." *United States v. White Mtn. Apache Tribe*, 537 U.S. 465, 476 (2003) (citations omitted).

The Court of Federal Claims found that "[n]either the Executive Order of 1882 nor the Act of 1958 *expressly* imposes a duty on defendant to protect the quality of plaintiff's water supply," and so the Hopi Tribe had "failed to clear the first 'hurdle' in establishing . . .

jurisdiction." A9 (emphasis added).[2] The Court of Federal Claims, however, did not consider the *Winters* Doctrine at all and held instead that "the Act of 1958 does not confer a duty to protect the water supply or, indeed, to manage water or other resources in any way." A7. Because the court wrongly concluded that the Hopi Tribe "failed to show that Congress has defined the federal government's trust duties in such a way as to authorize plaintiff's suit for damages in this court," A2, it erroneously dismissed the complaint.

The Act of 1958, incorporating the requirements of the earlier 1882 Executive Order, is the main statute establishing the scope of the United States' trust responsibility towards the Hopi in this instance. The Act of 1958 provides that the "lands described in the [1882 Executive Order] are hereby declared to be held by the United States in trust for the Hopi Indians . . . ." Public Law 85-547, Sec. 1. As explained further below, "lands" in the 1958 Act must be read as "lands and waters" pursuant to the *Winters* Doctrine and relevant canons of statutory construction. Moreover, the United States extensive control

---

[2] *See also* A7 ("Nothing in the text of either the Act of 1958 or the Executive Order of 1882 mentions any duty on the part of defendant to protect the quality of drinking water on the Reservation.").

over the Hopi Tribe's water resources, pursuant to a network of statutory authorities and directives, further establishes the scope of the United States' trust obligations to the Tribe. Contrary to the United States' protestations, these actions are not irrelevant and should be considered in evaluating the court's jurisdiction under the Indian Tucker Act.

In looking at the underlying substantive law creating the trust relationship, the Court must also consider actual control exercised by the Government over the trust resource. In *United States v. White Mtn. Apache Tribe*, 537 U.S. 465, 470 (2003), the U.S. Supreme Court affirmed a Federal Circuit decision finding that the "the United States' use of property . . . triggered the duty of a common law trustee to act reasonably to preserve any property the [Government] had chosen to utilize, an obligation fairly interpreted as supporting a claim for money damages." In that case, like in *Mitchell II*, the United States' actual control over the resource helped "provide focus for the trust relationship." *Id.* at 477.

The second step in the *Mitchell II* analysis focuses on "whether the relevant source of substantive law 'can fairly be interpreted as

mandating compensation for damages sustained as a result of a breach of the duties [the governing law] impose[s].'" *Navajo I*, 537 U.S. at 506 (quoting *Mitchell II*, 463 U.S. at 219). The act establishing the trust duty "need not *explicitly* provide that the right or duty it creates is enforceable through a suit for damages," *United States v. Navajo Nation* ("*Navajo II*"), 556 U.S. 287, 290 (2009) (emphasis original); rather, it need only "fairly be *interpreted* as mandating compensation by the Federal Government for the damage sustained," *White Mtn. Apache*, 537 U.S. at 472 (citations omitted) (emphasis original). "It is enough then, that a statute creating a Tucker Act right be reasonably amenable to the reading that it" provides for a damages remedy. *Id.* at 473.

Where "the statutes and regulations at issue . . . clearly establish fiduciary obligations of the Government . . . they can fairly be interpreted as mandating compensation." *Mitchell II*, 463 U.S. at 226. "Given the existence of a trust relationship, it naturally follows that the Government should be liable in damages for the breach of its fiduciary duties." *Id.* Particularly where the claim involves the failure to maintain or repair trust assets, the Supreme Court has recognized that

given the "duty on the part of the trustee to preserve corpus, it naturally follows that the Government should be liable in damages for the breach of its fiduciary duties." *White Mtn. Apache*, 537 U.S. at 475-76 (internal quotation omitted). While the Court of Federal Claims did not consider the second step of the *Mitchell II* analysis, it is appropriate for this Court to resolve that question at this juncture as well, as it was briefed extensively below and as the analysis required by the two steps of *Mitchell II* are intricately interwoven.

## I.    Standard of Review

"Whether the Court of Federal Claims properly dismissed [the Hopi Tribe's] complaint for lack of subject matter jurisdiction is a question of law that [the Federal Circuit Court] review[s] de novo." *Wilson v. United States*, 405 F.3d 1002, 1008 (Fed. Cir. 2005) (internal citation omitted). In addition, the meaning of treaty language is a question of law to be reviewed de novo. *United States v. Washington*, 157 F.3d 630, 642 (9th Cir. 1998). Thus this Court must conduct a searching review of the decision of the Court of Federal Claims and reach a contrary decision where warranted by applicable law.

In ruling on a motion to dismiss for lack of jurisdiction, the Court must "view the alleged facts in the complaint as true, and if the facts reveal *any reasonable basis* upon which the non-movant may prevail, dismissal is inappropriate." *Pixton v. B&B Plastics, Inc.*, 291 F.3d 1324, 1326 (Fed. Cir. 2002); *see also Travelers Indem. Co. v. United States*, 72 Fed. Cl. 56, 59 (2006) (the court must accept all facts pled in the complaint and "draw all reasonable inferences in plaintiff's favor." (internal quotation omitted)). In other words, the Court must deny the motion "unless it is beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." *Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed. Cir. 1989). In addition, where subject matter jurisdiction is challenged, the plaintiff also has an opportunity to "come forward with evidence establishing the court's jurisdiction" and "must be given an opportunity to be heard before dismissal is ordered." *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.3d 746, 748 (Fed. Cir. 1988); *see also* A19-20 (admitting same). This Court reviews "[w]hether the trial court properly dismissed an action for lack of jurisdiction . . . *de novo*." *Pixton*, 294 F.3d at 1326.

II.  **The Court of Federal Claims Erred in Failing to Recognize that the Act of 1958 Includes a Reservation of Water Adequate in Quantity and Quality Sufficient to Fulfill the Purposes of the Hopi Reservation.**

Step One of the Indian Tucker Act analysis requires the Court to evaluate whether a trust relationship exists between the United States and the Hopi Tribe with respect to the Hopi Tribe's drinking water systems, and whether the Hopi Tribe has alleged a breach of such duties.  *See Navajo I*, 537 U.S. at 506.

There indisputably is a trust relationship between the United States and the Hopi Tribe.  *See* A23 (admitting that "the United States holds the Hopi Reservation [and] Hopi's reserved water rights in trust"); A25 ("There is no question that the United States Government has a general trust relationship with Tribes." (internal quotation omitted)). The Act of 1958 unequivocally states that the lands comprising the Hopi Reservation be held "in trust" by the United States.  Public Law 85-547, Sec. 1.  Indeed, in *Fort Mojave Indian Tribe v. United States*, the Court of Federal Claims confirmed jurisdiction over a damages claim brought by the Fort Mojave and Colorado River Indian Tribes for the loss of *Winters* rights due to serious errors made by the United States while

26

representing the tribes' interests in a water rights adjudication. The court concluded that:

> the statutes and executive orders establishing the Tribes' respective reservations created a trust arrangement between [the Tribes] and the United States. . . . Hence, plaintiffs' allegation that the government breached that trust by failing adequately to represent plaintiffs' interests . . . properly states a claim for breach of trust addressable in [the Court of Federal Claims].

23 Cl. Ct. 417, 426 (1991). Likewise, in *White Mountain Apache*, the Supreme Court recognized that even where the underlying act does not "expressly subject the Government to duties of management and conservation, the fact that the property occupied by the United States is expressly subject to a trust supports a fair inference that an obligation to preserve the property improvements was incumbent upon the United States as trustee." 537 U.S. at 475. The only question as to whether the Hopi Tribe has met the first step of the Indian Tucker Act analysis here is the precise scope of its trust relationship with the United States.

The Act of 1958, when properly read, clearly obligates the United States to properly maintain the Hopi Tribe's drinking water resources in accordance with regulatory minimum requirements as part of the trust corpus. When interpreting the 1958 Act, several canons of

27

construction and legal definitions must be incorporated. First, the *Winters* doctrine provides that when Congress sets aside Indian reservations, it sets aside adequate water to fulfill the purpose of the reservation, even though the enacting legislation may not expressly so state. Second, because the Hopi Reservation was established in 1958, long after *Winters* was decided, references to "land" in the Act of 1958 mean must mean "land and water," and courts have recognized that "land" and "trust" in the context of federal land management are terms of art that must be construed as such. *Cf. Jicarilla Apache Nation*, 131 S. Ct. at 2330 (employing canons of construction to interpret the trust-creating statute at issue). The Court must recognize that particular words have long known and particular meaning in background trust law, and construe them consistently with such meanings.

The Court of Federal Claims erred when it held that the "Executive Order of 1882 simply describes the *land* comprising the Reservation," and that the "Act of 1958 provides that plaintiff's *land* is 'to be held by the United States in trust for the Hopi Indians," and, as such "does not confer a duty to protect the water supply or, indeed to manage water or other resources in any way." A7 (emphasis added).

28

The court thus wrongly concluded that the trust created by the Act of 1958 is "a 'bare trust,' devoid of any particular duty to manage resources, [and] does not require the federal government to exercise the common law duties of trustees." A8. The court failed to recognize the *Winters* Doctrine or the fact that the use of the word "land" in the 1882 Executive Order and Act of 1958 must be construed to mean both land and water of a sufficient quantity and quality so as to support a permanent homeland for the Hopi people. The precise scope of the trust relationship is also informed by the network of statutes and regulations authorizing federal government action, *see Navajo I*, 537 U.S. at 504-05 (discussing *Mitchell II*, 463 U.S. at 224), and the United States' extensive control over tribal resources, *see White Mtn. Apache*, 537 U.S. at 477.

A.   The *Winters* Doctrine Establishes that "Land" Reservations Include Water.

The *Winters* Doctrine is universally accepted and requires that along with the land, the United States also reserved a sufficient quantity and quality of water to fulfill the purpose of the Reservation. *Winters*, 207 U.S. at 576-77. The doctrine is based on general canons of construing and interpreting agreements with Indian tribes, *id.*, and

provides that when the government, "when it created [an] Indian Reservation, intended to deal fairly with the Indians by reserving for them the waters without which their lands would have been useless." *Arizona*, 373 U.S. at 600.

The *Winters* Doctrine adds water rights to the definition of "land" in federal government land reservations. Indeed, the U.S. Supreme Court "has long held that when the Federal Government withdraws its land from the public domain and reserves it for a federal purpose, the Government, by implication, reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation." *Cappaert*, 426 U.S. at 138. "This doctrine, known as the *Winters* doctrine, is unquestionably a matter of *federal* . . . law." *Arizona v. San Carlos Apache Tribe of Ariz.*, 463 U.S. 545, 574 (1983) (emphasis original).

The *Winters* Doctrine applies to both surface water and groundwater, *Cappaert*, 426 U.S. at 143, and to both quantity and quality of the water. In *Winters v. United States*, the United States had "alleged with detail" that "it is essential and necessary that all of the waters of the river flow down the channel uninterruptedly and

undiminished in quantity and *underteriorated in quality*." 207 U.S. at 567 (emphasis added). The United States Supreme Court agreed and held that "it cannot be supposed that the Indians were alert to exclude by formal words every inference which might militate against or defeat the declared purpose of themselves and the government, even if it could be supposed that they had the intelligence to foresee the 'double sense' which might some time be urged against them." *Id.* at 577.

Indeed, any other application would be nonsensical. The reserved water is "intended to satisfy the future as well as the present needs of the Indian Reservations . . . ." *Arizona*, 373 U.S. at 600. It is impossible to separate the quality of the water from whether that water can fulfill the "future as well as the present needs of the Indian Reservations." *See, e.g. United States v. Gila Valley Irrigation Dist.*, 920 F. Supp. 1444, 1454-55 (D. Ariz. 1996), *aff'd*, 117 F.3d 425 (9th Cir. 1997) (restricting use of upstream irrigation diversions to preserve water quality for the San Carlos Reservation). *Cf. San Carlos Apache*, 463 U.S. at 574 (acknowledging that "[n]ot all of the issues arising from the application of the *Winters* doctrine have been resolved, because in

31

the past the scope of Indian reserved rights has infrequently been adjudicated").

The Arizona Supreme Court has recognized that:

when these reservations were established, the federal government was aware 'that most of the lands were of the desert kind – hot, scorching sands – and that water from the river would be essential to the life of the Indian people and to the animals they hunted and the crops they raised.

* * *

In its role as trustee of [Indian reservations], the government must act for the Indians' benefit. This fiduciary relationship is referred to as one of the primary cornerstones of Indian law. Thus, treaties, statutes, and executive orders are construed liberally in the Indians' favor. Such an approach is equally applicable to the federal government's actions with regard to water for Indian reservations. The purposes of Indian reserved rights are given broader interpretation in order to further the federal goal of Indian self sufficiency.

*In re the Gen. Adjudication of All Rights to Use Water in the Gila R. Sys. & Source*, 201 Ariz. 307, 313 (Ariz. 2001) (en banc) (internal citations omitted). *See also* A12 ¶ 14 (alleging that the "arid reservation land is uninhabitable without water").

**B.    "Land" and "Trust" in the Act of 1958 Must Include the Established Common Law Definitions of those Terms.**

By the time Congress affirmed the Executive Order establishing the Hopi Reservation in 1958, the *Winters* Doctrine had long been black-letter law.    Congress would have been cognizant of the applicability of the *Winters* Doctrine when it established the Hopi Reservation. *Cf. New Mexico v. Aamodt*, 537 F.2d 1102 (10th Cir. 1976) (Barrett, concurring and dissenting) (recognizing that where a Reservation was established after *Winters*—*i.e.*, after 1906—"Congress was well aware during deliberations and hearings held prior to [establishing the Reservation] that the Winters Doctrine was fully applicable . . . ."). "The normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific." *Midlantic Nat'l Bank*, 474 U.S. at 501 (internal quotation omitted). Because the Act of 1958 did nothing to modify or constrict the Hopi Tribe's reserved water rights, it must be assumed that Congress intended the *Winters* Doctrine to apply fully to the establishment of the Hopi Reservation.

The Supreme Court has recognized specifically that it is appropriate to consider common law trust principles in interpreting

33

sources of substantive law for purposes of analyzing jurisdiction under the Tucker Act and Indian Tucker Act. For example, in *United States v. White Mountain Apache Tribe*, the Supreme Court held that a statute providing certain land to be "held in trust" for the White Mountain Apache Tribe, subject to certain uses by the United States government, created a trust duty to maintain the buildings thereon as part of the "trust corpus." 537 U.S. at 474-76; *See also id.* at 480 (Ginsberg, J. and Breyer, J. concurring).

The Supreme Court reiterated this rule as recently as 2011 recognizing that it has "looked to common-law principles to inform [its] interpretation of statutes and to determine the scope of liability that Congress has imposed." *Jicarilla*, 131 S. Ct. at 2324; *see also Cobel v. Norton*, 240 F.3d 1081, 1101 (D.C. Cir. 2001) ("The general 'contours' of the government's obligations may be defined by statute, but the interstices must be filled in through reference to general trust law."). Indeed, as the Tenth Circuit has recognized, "[w]hile the Supreme Court has said we may not employ traditional trust principles inconsistent with Congress's statutory directions, the court has *also* said we *may* refer to traditional trust principles when those principles

are consistent with the statute and help illuminate its meaning." *Fletcher*, 730 F.3d at 1210 (original emphasis) (relying on *Jicarilla*, 131 S. Ct. 2325).

Moreover, "land" must be interpreted as a term of art consistent with *Winters*. "[I]t is a 'cardinal rule of statutory construction' that, when Congress employs a term of art, 'it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken . . . ." *FAA*, 132 S. Ct. at 1449 (quoting *Molzof*, 502 U.S. at 307); *see also Moran v. Prather*, 90 U.S. 492, 497 (1874) ("Terms of art or technical phrases are to be interpreted according to their received meaning with those who profess the art or profession to which they belong."). In other words, where a term is "transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it." *Sekhar v. United States*, --- U.S. ---, 133 S. Ct. 2720, 2724 (2013) (quoting Justice Frankfurter, "Some Reflections on the Reading of Statutes," 47 Colum. L. Rev. 527, 537 (1947)).

Congress's specific directive that the United States hold the "lands described in the Executive order dated December 16, 1882" in trust for

the Hopi Tribe, Pub. Law 85-547, Sec. 1, includes the established common law meaning of those terms. As shown above, *Winters* and its progeny established that "land" in federal land reservation statutes includes water of sufficient quantity and quality to meet the purposes of the reservation. *Cf. New Mexico v. Aamodt*, 618 F. Supp. 993, 996 (D.N.M. 1985) (modifying the magistrate's report and recommendation to remove the word "reserved" as that is "a term of art in federal land law which applies to the federal government's setting aside of particular land for a particular purpose" and "is the basis for the *Winters* doctrine of federal reserved water rights."). "Trust" similarly is a term of art that is "commonly understood to entail certain fiduciary obligations, and invests the United States with discretionary authority to make direct use of portions of the trust corpus." *White Mtn. Apache*, 537 U.S. at 480 (Ginsberg, J. & Breyer, J., concurring).

In *White Mountain Apache Tribe*, the United States used certain buildings on the Fort Apache Military Reservation, which was held in trust for the White Mountain Apache Tribe. 537 U.S. at 468-69. Some of the buildings and appurtenances had fallen into disrepair during the United States' use, and so the Tribe sued the United States for damages

sufficient to rehabilitate the property based on the United States "breach of fiduciary duty to maintain, protect, repair and preserve the trust property." *Id.* at 469 (internal quotations to pleadings omitted). The United States argued that subject matter jurisdiction was lacking under *Mitchell* and its progeny. *Id.* at 469-70. The U.S. Supreme Court disagreed, holding that the act that established the reservation "expressly defines a fiduciary relationship in the provision that Fort Apache be 'held by the United States in trust for the White Mountain Apache Tribe,'" *id.* at 474-75[3], which "supports a fair inference that an obligation to preserve the property improvements was incumbent on the United States as trustee," *id.* at 476. The Court distinguished *Mitchell II* and *White Mountain Apache*, where actual control and use was exercised pursuant authorizing statutes, from *Mitchell I*, where the statute at issue "failed to place the United States in a position to discharge the management responsibility asserted." 537 U.S. at 477. The Court further explained that its holding arose out of the "fundamental common-law duties of a trustee . . . to preserve and

---

[3] Compare with the Act of 1958 that provides that the Hopi Reservation be "held by the United States in trust for the Hopi Indians . . . ." Act of 1958.

maintain trust assets." *Id.* (internal quotation omitted); *see also Fort Mojave Indian Tribe*, 23 Cl. Ct. at 426 ("Where a trust relationship exists, the trustee . . . is obligated to the beneficiary to do all acts necessary for the preservation of the trust res which would be performed by a reasonably prudent man employing his own like property for purposes similar to those of the trust." (internal quotation omitted)). This concept "confirms the commonsense assumption that a fiduciary actually administering trust property may not allow it to fall into ruin on his watch." *White Mtn. Apache*, 537 U.S. at 476.

### C. The United States' Argument that It Has No Obligation to Protect the Drinking Water Resources of the Hopi Tribe Because the Act of 1958 Created a "Bare" or "Limited" Trust Must Be Rejected.

The United States has argued, and the Court of Federal Claims held, that, although there is unquestionably a trust relationship between the United States and the Hopi Tribe, A23; A25, it is a "bare" or "limited" trust, A7-8. The United States' argument is based in large part on the U.S. Supreme Court decision in *United States v. Jicarilla Apache Nation*, 131 S. Ct. 2313 (2011). *See* A321; A25.

*Mitchell* and its progeny, including *Jicarilla*, however, do not support the United States' extremely narrow reading of the Act of 1958.

38

The United States appears to believe that because "the Executive Order setting aside the Reservation does not contain any specific prescriptions that mandate the United States construct a water supply system or deliver a certain quality of drinking water to the Hopi villages," that no duty exists. A325. This position is directly contrary to the Supreme Court's instructions on interpretation of the scope of the United States' trust obligations. Indeed, *Mitchell II* makes clear that a trust obligation can arise "*even though nothing is said expressly in the authorizing or underlying statute (or other fundamental document) about a trust fund, or a trust or fiduciary connection.*" *Mitchell II*, 463 U.S. at 225 (internal quotation omitted) (emphasis added). *See also Fort Mojave Indian Tribe*, 23 Cl. Ct. at 425 (the fact that the "statute and orders did not explicitly use the terms 'trust' or 'fiduciary,' nor did they mention any potential government financial liability" was "not determinative in assessing whether sovereign immunity was waived so as to permit a breach of trust suit.").

In *Jicarilla*, the U.S. Supreme Court reiterated this concept, and explained that while courts should look first to statutes, regulations, and other such law, they must also "look[] to common-law principles to

39

inform [their] interpretation of statutes and to determine the scope of liability that Congress has imposed," 131 S. Ct. at 2325 (citing *White Mtn. Apache*, 537 U.S. at 475-76), and "apply common-law trust principles where Congress has indicated it is appropriate to do so," *id.* As shown above, the court must interpret the Act of 1958 in accordance with established canons of construction and the universally recognized *Winters* Doctrine. The *Winters* Doctrine is firmly established as part of the special fiduciary relationship between the United States and Indian Tribes, whereas the plaintiff in *Jicarilla* attempted to invoke an exception to the attorney-client privilege, borrowed entirely from "the context of common-law trusts." *Id.* at 2319.[4] The Hopi Tribe is not asking the court to transplant common-law trust concepts into the special trust relationship between the United States and Indian tribes; rather, simply to recognize specific contours of that unique trust relationship as articulated by binding Supreme Court precedent.

The opinion in *Jicarilla* also highlights the fact that "the Government has often structured the trust relationship to pursue its

---

[4] *Jicarilla* is a unique case dealing with the United States' relationship to its counsel and the attorney-client privilege, not management of tribal resources like land, water, or timber considered in other trust cases.

own policy goals," *id.* at 2324, and that these policy goals are appropriately considered in determining the scope of the trust relationship, *id.* at 2326 ("the Government exercises its carefully delimited trust responsibilities in a sovereign capacity to implement national policy respecting Indian tribes."); *id.* ("the terms of the trust relationship embody policy goals of the United States."). The policy goal of the United States in establishing the Hopi Reservation was to provide a permanent home to the Hopi people. A14 ¶ 27; A12 ¶ 13. The United States has also stated expressly that it is "the policy of the United States, that all Indian communities and Indian homes . . . be provided with safe and adequate water supply systems as soon as possible." 25 U.S.C. § 1632(a)(5). This policy was adopted with specific recognition that "Indian people suffer an inordinately high incidence of disease, injury, and illness directly attributable to the absence of inadequacy of such systems." 25 U.S.C. § 1632(a)(2). As such, it is entirely consistent with the United States' policy goals towards the Hopi Tribe to "maintain, protect, repair and preserve" the drinking water resources that permit the arid landscape to be used as a

41

homeland, and the concordant trust obligations must be acknowledged.

*White Mtn. Apache*, 537 U.S. at 469.

### D. The Hopi Tribe Alleged a Breach of the Trust Obligations Arising from the Act of 1958.

The final prong of the first step of the Indian Tucker Act analysis is that the Hopi Tribe must "allege that the Government has failed faithfully to perform those duties" arising from the substantive law identified. *Navajo I*, 537 U.S. at 506. Indeed, the complaint in this matter squarely alleges: "The United States has failed to provide the Hopi Reservation with a sufficient quantity and quality of water necessary to maintain the Reservation as a permanent homeland for the Hopi Tribe, and because of the United States' failure the Hopi Tribe has suffered and will continue to suffer damages." A15 ¶ 33.

### III. The United States, as Trustee, Is Obligated to Protect the Drinking Water Resources of the Hopi Tribe as Part of the Trust Corpus.

Once the existence of a trust relationship has been established, it is incumbent on the trustee "to maintain, protect, repair and preserve the trust property," *White Mtn. Apache*, 537 U.S. at 469, and "to protect the trust property against damage or destruction," *Fort Mojave Indian Tribe*, 23 Cl. Ct. at 426 (internal quotation omitted). Indeed, the

trustee is "obligated to the beneficiary to do all acts necessary for the preservation of the trust res which would be performed by a reasonably prudent man employing his own like property for purposes similar to those of the trust." *Id.*

### A. The United States' Actions Must Be Considered in Determining the Scope of Its Duty.

The United States Supreme Court has instructed that the United States' actions are relevant in determining the scope of the trust duty under the *Mitchell II* analysis.  In *Mitchell II*, the plaintiffs "based their money claims against the United States on various Acts of Congress and executive department regulations."  463 U.S. at 219.  The Court found that these authorities, pursuant to which the United States had played a "pervasive role" in the management and sale of timber resources, "establish[ed] the comprehensive responsibilities of the Federal Government in managing the harvesting of Indian timber." *Id.* at 219, 222 (internal citations omitted).

> Where the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or properties (unless Congress has provided otherwise) *even though nothing is said expressly in the authorizing or underlying statute (or other fundamental document) about a trust fund, or a trust, or a fiduciary connection.*

*Id.* at 225 (internal quotation omitted) (emphasis added). As recognized in *White Mountain Apache*, this is important because it shows that "the United States [is] in a position to discharge the management responsibility asserted." 537 U.S. at 477. Accordingly, "[to] determine the extent of the government's duties, courts often rely on the general law of trusts, once it has been established that an actionable claim for breach of trust exists." *Cohen's Handbook of Federal Indian Law* § 5.05[2], p.433 (2005 ed.).

While a "limited" or "bare trust" without defined contours, does not give rise to the same kind of trust responsibilities, *Mitchell II*, 463 U.S. at 224, "a fiduciary relationship *necessarily* arises when the Government assumes such elaborate control over forests and property belonging to Indians," *id.* at 225 (emphasis added). Indeed, the United States has legislated that "proper discharge of the trust responsibilities of the United States shall include . . . appropriately managing the natural resources located within the boundaries of Indian reservations and trust lands." 25 U.S.C. § 162a(d)(8). Thus in *Mitchell II*, "[a]ll of the necessary elements of a common-law trust are present: a trustee (the United States), a beneficiary (the Indian allottees), and a trust

44

corpus (Indian timber, lands, and funds)." *Id.* Indeed, "trust cases arising from actual control of a resource may involve imprecise statutory language." *Cohen's Handbook of Federal Indian Law* § 5.05[2], p.433 (2005 ed.).

Like in *Mitchell II*, as shown below, the United States has exercised "elaborate control" over the Hopi Tribe's water resources, pursuant to a network of statutes and regulations, giving rise to all of the common-law trust elements and establishing the United States' obligation to protect the trust corpus. Based on this principle, courts have regularly found a compensation-mandating fiduciary obligation where the United States undertakes comprehensive activities on Indian Reservations pursuant to various laws and regulations. Indeed, a fiduciary relationship between the United States and a tribe may arise from "a network of . . . statutes and regulations," as opposed to a single source. *Navajo I*, 537 U.S. at 504-05 (discussing *Mitchell II*, 463 U.S. at 224).

Moreover, where the United States chooses to act on behalf of a tribe, general trust duties are implicated. In *White Mountain* Apache, for example, the Supreme Court's determination that the United States

45

was obligated to maintain and repair the property as part of the trust corpus was buttressed by the fact that, as authorized by the 1960 Act, the United States actually made use of the property at issue. 537 U.S. at 475. The United States' use of the property "would presumably be intended to redound to the benefit of the Tribe in some way," which further supported the conclusion that the property should be treated as part of the trust corpus. *Id.* at 476.

Similarly, in *Fort Mojave Indian Tribe*, the court noted that, not only did the United States have a duty to maintain the trust corpus, but that the Tribes "do not fault defendant for refusing to represent plaintiffs' interests in *Arizona*, but rather for *choosing* to represent their interests and then doing so inadequately," 23 Cl. Ct. at 426-27 (emphasis original), and accordingly rejected the United States' argument that its actions were "totally discretionary" and thus could not give rise to a breach of trust action, *id.* at 426. Indeed, even where the United Sates has discretion as to when to act on behalf of the Tribes, "it does not follow that the government is free from accountability for its actions [there]in." *Id.* Thus, based on *Mitchell II*, *White Mountain Apache*, and *Fort Mojave Indian Tribe*, there can be no

lingering question that the scope of the United States' trust obligations

can be shaped by the actions of the United States.

### B. The United States Has Exercised Extensive Control of the Hopi Tribe's Water Resources Pursuant to a Wide Network of Statutes and Regulations.

The United States has undertaken extensive control of the Hopi

Tribe's water systems, including controlling the Tribe's water rights in

designing, installing, constructing, and maintaining the affected water

systems on the Hopi Reservation; using a significant amount of water

on the Hopi Reservation; and representing the Tribe in water

adjudications setting the extent of the reserved water right.

As an initial matter, as shown by the Hopi Tribe below, the United

States is responsible for designing, installing, constructing, and

maintaining the drinking water wells that are known to be supplying

water with unsafe arsenic levels to several Hopi villages.[5]  Specifically,

---

[5]  The Hopi Tribe has appropriately presented "evidence establishing the court's jurisdiction," *Reynolds*, 846 F.3d at 748; *see also* A19-20, to the extent that it is available to the Hopi Tribe.  However, because most of the records about the Hopi Tribe's groundwater wells are maintained by the United States and because discovery has not commenced in this case, the Hopi Tribe has not yet obtained many records about these wells.  The Court of Federal Claims denied the Hopi Tribe's request for jurisdictional discovery.  A9.  To the extent this Court determines that

the United States determined the placement and design of the supply wells. *See supra* 10-11. The United States selected, hired, and paid the contractors who constructed the wells and maintained the records. *See supra* 11. Indeed, most of the wells were designed and installed at a time when the Hopi Tribe "did not participate in, oversee, or otherwise contribute to the design, engineering, construction or installation of drinking water supply wells on the Hopi Reservation." A78 ¶ 13.

The affected wells are drilled into aquifers that have naturally high levels of arsenic. The United States has argued that the Hopi Tribe has not alleged "wrongful conduct by the United States that caused or contributed to the level of arsenic (which is naturally occurring) in the drinking water on the eastern side of the Hopi Reservation." A24. There is no dispute that the United States installed the wells at issue here, and then later lowered the standard for arsenic in drinking water, acknowledging that the levels in the Hopi systems are unsafe. All parties agree that water with arsenic levels at those found in the Hopi systems – in some cases four times over the MCL – are unsafe for human consumption. The United States refuses,

_____

the Tribe has not met the jurisdictional requirements of the Indian Tucker Act, the Tribe renews its request for jurisdictional discovery.

however, to rehabilitate the drinking water systems it designed and installed to provide a safe source of drinking water.

Indeed, as it became known that the United States has installed drinking water wells into portions of the aquifer containing indisputably unsafe levels of arsenic, the United States took actions to protect its own employees by providing an alternative water supply to the BIA Keams Canyon system and by treating water from wells that could affect federal employees to reduce arsenic levels. *See* A75-76 ¶ 3 & A86. These mitigation measures are temporary and do not go far enough, as they neither provide a permanent solution for the Keams Canyon system nor provide relief for the rest of the Hopi members who continue to be supplied with non-potable water. *Id.*; A89-91 (describing the "Interim Arsenic Mitigation Project").

The United States also is a significant water user on the Hopi Reservation. Indeed, there is no dispute that the United States "owns and operates the water supply system for Keams Canyon." A17. The Keams Canyon system provides water to a BIA boarding school, IHS office buildings, the Hopi High School and the Second Mesa Day School, A75-76 ¶ 3; A86; A76 ¶ 4 & A110; A77-78 ¶ 12, A179 ¶ 185 & A238.

The United States also uses a significant amount of water from the Polacca supply wells at the Hopi Healthcare System, which includes a health center and offices.  A78 ¶ 14; A319-20 ¶¶ 4-8.

Finally, for over thirty years, the United States has represented the Hopi Tribe in ongoing water rights adjudication and negotiations. A25.  The United States acknowledges that it has "claimed water rights on behalf of the Hopi Tribe in the ongoing Little Colorado River Adjudication in Northern Arizona" (the "LCR Adjudication").  A22. Indeed, in the proposed final settlement in the LCR Adjudication, the United States would have reserved to *itself* "acting in its capacity as trustee for the Hopi Tribe," the right to use the water set aside for the Hopi Tribe.  Final Draft Water Rights Settlement (Mar. 8, 2012) ¶ 5 *available at* http://nnwrc.org/wp-content/uploads/2012/04/NHLCRS-Settlement-Agreement_13098967_16-23.pdf.

These actions and assumptions of control over of the Hopi Tribe's water resources reflect the scope of the United States' trust obligations to the Hopi Tribe.  Contrary to the United States' arguments, these actions are not considered in vacuum, but rather in combination with the meaning of the Act of 1958 and other authorities authorizing and

50

directing the United States to perform these actions. Congress has directed IHS "to construct, improve, extend, or otherwise provide and maintain, by contract or otherwise, essential sanitation facilities, including domestic and community water supplies and facilities . . . for Indian homes, communities and lands." 42 U.S.C. § 2004a(a)(1) (P.L. 86-121). It was pursuant to this authority that at least Polacca Wells #5 and #6 were constructed. *See* A120; A126 (completed on IHS P.L. 86-121 forms); *see also* A109 (finding the Hopi Public water supplies were constructed with federal funds, typically with infrastructure design and construction, and initial operation by IHS).

BIA similarly has been directed to oversee the "extension, improvement, operation, and maintenance of . . . development of water supplies." 25 U.S.C. § 13. DOI has also been directed to undertake improvements on the Hopi and Navajo Reservations. 25 U.S.C. § 631. Congress initially appropriated $2.5 million for the development of "[a]gency, institutional, and domestic water supply," 25 U.S.C. §631(9), over which the Tribe could only offer recommendations to be incorporated into the projects when they were "feasible and consistent" as determined by the Secretary of the Interior, 25 U.S.C. § 638. Under

*Mitchell II* and its progeny, the Court must consider these statutes, as they "place the United States in a position to discharge the management duty asserted," and thus "provide focus for the trust relationship" at issue. *White Mtn. Apache*, 537 U.S. at 477.

The United States thus has chosen to exercise its power to design, install, construct, and maintain the Hopi drinking water systems. As in *Fort Mojave Indian Tribe*, the United States' choice to undertake these actions "and then doing so inadequately," when coupled with the direct statutory directives outlined above, gives rise to a breach of trust claim. 23 Cl. Ct. at 427.

## IV. The Laws Governing the United States' Construction and Operation of Hopi Drinking Water Systems Can Be Read Fairly as Mandating Compensation.

The second half of the Indian Tucker Act analysis focuses on "whether the relevant source of substantive law 'can fairly be interpreted as mandating compensation for damages sustained as a result of a breach of the duties [the governing law] impose[s]." *Navajo I*, 537 U.S. at 506 (quoting *Mitchell II*, 463 U.S. at 291 (alteration original)). The law "need not *explicitly* provide that the right or duty it creates is enforceable through a suit for damages," but rather need only

52

"fairly be interpreted as mandating compensation." *Navajo II*, 556 U.S. at 290 (emphasis original). Where "the statutes and regulations at issue . . . clearly establish fiduciary obligations of the Government in the management and operation of Indian lands and resources, they can fairly be interpreted as mandating compensation . . . ." *Mitchell II*, 463 U.S. at 226. "Given the existence of a trust relationship, it naturally follows that the Government should be liable in damages for the breach of its fiduciary duties." *Id.* Particularly where the claim involves the failure to maintain an acceptable level of quality of the trust assets, either through maintenance, improvements, or repairs, the Supreme Court has recognized that "it naturally follows that the Government should be liable in damages for the breach of its fiduciary duties." *White Mtn. Apache*, 537 U.S. at 475-76 (quoting *Mitchell II*, 463 U.S. at 226). Indeed, a contrary requirement, "if carried to its conclusion, it would read the trust relation out of the Indian Tucker Act analysis; if a specific provision for damages is needed, a trust obligation and trust law are not." *Id.*

The Act of 1958, when properly read, along with the United States "elaborate control" over the Hopi Tribe's water resources, "clearly

53

establish fiduciary obligations of the Government in the management and operation of Indian lands and resources," and thus, "they can fairly be interpreted as mandating compensation by the Federal Government for damages sustained." *Mitchell II*, 463 U.S. at 226.

**V.    The Damages Suffered by the Hopi Tribe as a Result of the United States' Failure to Properly Design and Install the Drinking Water Wells on the Hopi Reservation Provides Jurisdiction to the Court of Federal Claims Pursuant to the Indian Tucker Act.**

The Indian Tucker Act waives sovereign immunity and grants jurisdiction to the Court of Federal Claims for "any claim against the United States founded either upon the Constitution, or any act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated damages in cases not sounding in tort," 28 U.S.C. §§ 1491(a)(1) & 1505. "[B]y giving the Court of Claims jurisdiction over specified types of claims against the United States, the Tucker Act constitutes a waiver of sovereign immunity with respect to those claims." *Mitchell II*, 463 U.S. at 212.  The purpose of the Indian Tucker Act is to ensure that tribes have "'their fair day in court so that they can call the various Government agencies to account on the obligations that the Federal government assumed.'" *Id.* at 214 (quoting 92 Cong. Rec. 5312 (1946)).

54

The Hopi Tribe has estimated that it will cost over $20 million to address the United States' breach of its trust obligation.  *See* A15 (Request for Relief ¶ 1).   The United States has attempted to characterize the Hopi Tribe's request for relief as something other than damages.  *See, e.g.*, A18 (alleging that "Plaintiff's primary purpose in bringing this litigation is to secure funding for the [Hopi Arsenic Mitigation Project]."").   But the U.S. Supreme Court has rejected this tactic by the United States before.   In *White Mountain Apache*, the United States argued that damages were inappropriate on a claim for failure to maintain or repair the trust property.   The Court held that this was "clearly wrong."  537 U.S. at 478.

> If the Government is suggesting that the recompense for run-down buildings should be an affirmative order to repair them, it is merely proposing the economic (but perhaps cumbersome) equivalent of damages.  But if it is suggesting that relief must be limited to an injunction to toe the fiduciary mark in the future, it would bar the courts from making the Tribe whole for deterioration already suffered, and shield the Government against the remedy whose very availability would deter it from wasting trust property in the period before a Tribe has gone to court for injunctive relief.

*Id.* at 478-79.

Similarly, the damages claimed by the Hopi Tribe in this action are intended to directly remedy the breach of trust by the United States

of failing to maintain the drinking water supplies of the Tribe, a vital part of the trust corpus, at an acceptable level. The Tribe simply asks for damages in the amount necessary to provide a permanent and safe alternative source of drinking water to the Affected Villages, A15-16 at Request for Relief ¶¶ 1, 3, compensation for temporary drinking water treatment for the Affected Villages in the meantime, *id.* ¶¶ 2, 3, and any other damages the court may deem just and proper, *id.* ¶ 4. Just like in *White Mountain Apache*, the fact that the money is intended to be used to improve the infrastructure does not negate that the claim is one for damages.

## CONCLUSION

For the reasons set forth above, the Hopi Tribe respectfully requests that this Court reverse the decision of the Court of Federal Claims below and accordingly reinstate its Complaint.

Dated: February 21, 2014    Respectfully submitted,


   /s/ Michael D. Goodstein
Michael D. Goodstein

HUNSUCKER GOODSTEIN PC
5335 Wisconsin Avenue, NW
Suite 360
Washington, DC 20015
(202)895-5380 (ph)
(202)895-5390 (fax)
mgoodstein@hgnlaw.com

*Attorneys for Plaintiff/Appellant*
*The Hopi Tribe*

## PROOF OF SERVICE

I hereby certify that on February 21, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

_/s/ Michael D. Goodstein_

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

   ☐ The brief contains 11,152 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

   ☐ The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Century, 14 point font.

_/s/ Michael D. Goodstein_
(Signature of Attorney)

Michael D. Goodstein
Attorney for Plaintiff/Appellant

February 21, 2014

No. 14-5018

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

THE HOPI TRIBE,
*A Federally Recognized Tribe*

Plaintiff/Appellant,

v.

THE UNITED STATES OF AMERICA

Defendant/Appellee

Appeal from the United States Court of Federal Claims
Case No. 12-45 L
The Honorable Lawrence J. Block, Judge Presiding

## REQUIRED ADDENDUM

Michael D. Goodstein
HUNSUCKER GOODSTEIN PC
5335 Wisconsin Avenue NW
Suite 360
Washington, DC 20015
Ph: (202) 895-5380
Fax: (202) 895-5390

*Attorneys for Plaintiff/Appellant*
*The Hopi Tribe*

## ORAL ARGUMENT REQUESTED

59

# In the United States Court of Federal Claims

**No. 12-45 L**

**THE HOPI TRIBE, A FEDERALLY
RECOGNIZED INDIAN TRIBE,**

                                                                 **JUDGMENT**

    **v.**

**THE UNITED STATES**

Pursuant to the court's Opinion and Order, filed October 4, 2013, granting defendant's motion to dismiss for lack of subject-matter jurisdiction,

IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that the complaint is dismissed.

                                      Hazel C. Keahey
                                      Clerk of Court

**October 4, 2013**              By:     s/Lisa L. Reyes

                                        Deputy Clerk

<u>NOTE</u>: As to appeal, 60 days from this date, see RCFC 58.1, re number of copies and listing of <u>all plaintiffs</u>. Filing fee is $455.00.

# United States Court of Federal Claims

No. 12-45 L

October 4, 2013

_____

**THE HOPI TRIBE, a federally**
**recognized Indian Tribe,**

                     *Plaintiff,*

**v.**

**UNITED STATES OF AMERICA,**

                     *Defendant.*

_____

Motion to dismiss; Subject-matter
jurisdiction; Sovereign immunity;
Indian trust

 

*Michael D. Goodstein*, Hunsucker Goodstein PC, Washington, DC, for plaintiff.

*Maureen E. Rudolph*, Environment & Natural Resources Division, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

*Block, Judge.*

    Plaintiff, an Indian tribe, brought this suit to recover damages for breach of trust. The alleged breach consists of defendant's supposed failure to ensure that the water supply on plaintiff's reservation contains safe levels of arsenic. Before the court is defendant's motion to dismiss for lack of subject-matter jurisdiction, in which defendant asserts that plaintiff has failed to identify an applicable fiduciary duty. The central legal question in this case, therefore, concerns the precise scope of the federal government's duties as trustee with respect to Indian trusts. See generally *United States v. Mitchell (Mitchell I)*, 445 U.S. 535 (1980). The answer to this inquiry has a long and sometimes acerbic pedigree. But there are some constants.

    To be sure, the very notion of a tribal trust relationship is intertwined with the sovereignty of the United States: "Throughout the history of the Indian trust relationship, we have recognized that the organization and management of the trust is a sovereign function subject to the plenary authority of Congress." *United States v. Jicarilla Apache Nation*, 131 S. Ct. 2313, 2323 (2011) (citing *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 169, n.18 (1982); *United States v. Wheeler*, 435 U.S. 313, 319 (1978); *Winton v. Amos*, 255 U.S. 373, 391 (1921); *Lone Wolf v. Hitchcock*, 187 U.S. 553, 565-66 (1903); *Cherokee Nation v. Hitchcock*, 187 U.S. 294, 308 (1902); *United States v. Cadelaria*, 271 U.S. 432, 439 (1926); and *Tiger v. Western Investment Co.*, 221 U.S. 286, 315 (1911)). As will become clear, in this case, plaintiff has failed to show that Congress has defined the federal government's trust duties in such a way as to authorize plaintiff's suit for damages in this court. Accordingly, the court must grant defendant's motion to dismiss.

A2

# I. BACKGROUND

## A. Plaintiff's Complaint

Plaintiff is a federally recognized Indian Tribe, Compl. ¶ 9, residing on the Hopi Reservation (the "Reservation") in Arizona, *id.* ¶¶ 11, 13. Although the land is uninhabitable without drinking water, id. ¶ 14, the public water systems serving villages on the eastern portion of the Reservation contain levels of arsenic higher than what Environmental Protection Agency (EPA) regulations, *see* 40 C.F.R. § 141.62, permit, Compl. ¶ 18. According to plaintiff, excessive consumption of arsenic can cause serious medical harm, including harm to the nervous system, heart and blood vessels, skin, and other organs. *Id.* ¶ 19.

Plaintiff brought this suit claiming that defendant, through the Bureau of Indian Affairs (BIA), has committed a breach of trust by failing to provide plaintiff with an adequate supply of drinking water. *Id.* ¶¶ 4, 22, 33. Plaintiff claims that defendant's trust duties flow from an executive order creating the Reservation (the "Executive Order of 1882") and a subsequent Act of Congress incorporating the requirements of that executive order by reference (the "Act of 1958"), *see* 72 Stat. 493. Compl. ¶ 6, 28. According to plaintiff, by establishing the Reservation and holding the land in trust, the Executive Order of 1882 and the Act of 1958 created a duty on the part of defendant to protect the trust property, including the Reservation's water supply. *Id.* ¶¶ 26-32. Plaintiff asserts that defendant breached this duty by failing to ensure that the arsenic level in the water supply complied with EPA standards. *Id.* ¶¶ 18, 22, 33.

## B. Defendant's Motion To Dismiss

Defendant filed a motion to dismiss the complaint for lack of subject-matter jurisdiction. *See* Def.'s Motion To Dismiss, ECF Dkt. 10, at 1. Defendant contends that plaintiff has failed to identify a source of law creating a legally enforceable duty requiring defendant to provide a certain quality of drinking water to the Reservation. *Id.* at 4. According to defendant, neither the Executive Order of 1882 nor the Act of 1958 imposes such a duty. *See id.* at 6-7. Defendant concedes that it holds plaintiff's water rights in trust but argues that this general trust relationship does not suffice to establish a specific trust duty to maintain water quality. *Id.* at 7 (citing *Mitchell I*, 445 U.S. 535; *Navajo I*, 537 U.S. 488; *Navajo II*, 556 U.S. 287).

Moreover, defendant argues, the sources of law plaintiff identifies in its complaint cannot "fairly be interpreted" as mandating compensation. *Id.* at 11. According to defendant, the Act of 1958 simply "provides a mechanism for judicial resolution of what land comprises the Hopi Reservation"; it does not support "a fair inference to money damages." *Id.* at 12. Likewise, defendant argues that 40 C.F.R. § 141.62—the Safe Drinking Water Act (SDWA) regulation cited in plaintiff's complaint—simply "contain[s] the maximum contaminant level for arsenic in drinking water"; it does not "expressly or impliedly contain language mandating money damages." Def.'s Motion To Dismiss at 12. Finally, defendant avers that Congress has, pursuant to 42 U.S.C. § 1449(a)(1), provided a civil remedy for violations of the Safe Drinking Water Act and that the court ought not interpret a statute or regulation to be money-mandating where, as here, "Congress has provided an alternative remedy for the alleged wrongful conduct." Def.'s Motion To Dismiss at 12 (citing *United States v. Bormes*, 133 S. Ct. 12, 18-20 (2012)).

A3

## C. Plaintiff's Response

In response, plaintiff argues that "[t]he role that [the] United States plays with respect to Hopi water resources is far greater than a general trust relationship." Pl.'s Response to Motion To Dismiss, ECF Dkt. 13, at 1. Specifically, plaintiff argues that "the United States has exercised sufficient involvement in and control over the provision of water to the Hopi Reservation to create an enforceable duty, the breach of which warrants an award of damages." *Id.* at 2. To support this argument, plaintiff relies on an array of diverse statutory provisions dealing with federal responsibility over water supply. *Id.* at 15-16.

For instance, plaintiff cites 25 U.S.C. § 162a(d)(8), which provides that, in exercising his or her trust responsibilities with respect to tribal funds, the Secretary of the Interior shall "[a]ppropriately manag[e] the natural resources located within the boundaries of Indian reservations and trust lands." Additionally, plaintiff notes that, pursuant to 25 U.S.C. § 1632(a), Congress has declared it "the policy of the United States, that all Indian communities and Indian homes . . . be provided with safe and adequate water supply systems and sanitary sewage waste disposal systems as soon as possible." Plaintiff also finds it pertinent to mention that the Bureau of Indian Affairs has express authority over the "extension, improvement, operation, and maintenance of . . . development of water supplies, 25 U.S.C. § 13, and that the Indian Health Service is authorized "to construct, improve, extend, or otherwise provide and maintain . . . domestic and community water supplies and facilities . . . for Indian homes, communities and lands," 42 U.S.C. § 2004a(a)(1). Moreover, points out plaintiff, the Secretary of the Interior is authorized and directed to "undertake . . . a program of basic improvements for the conservation and development of the resources of the . . . Hopi Indians," 25 U.S.C. § 631, and Congress has appropriated $2.5 million for such a program with respect to "[a]gency, institutional, and domestic water supply," *id.* § 631(9)—a program for which the Secretary need follow recommendations of the Hopi Indians only if the Secretary deems those recommendations "feasible and consistent" with the program's objectives, *id.* § 638. Plaintiff also insists that defendant's role in building and maintaining water facilities on the Reservation has been extensive, Pl.'s Response to Motion To Dismiss at 16-19, submits declarations seeking to establish that fact, *see id.* attachments, and requests discovery to find further facts supporting this "control"-based theory of jurisdiction, *see id.* at 34-35.

Of course, because plaintiff did not allege a violation of § 162a(d)(8) or any of these other statutes in its complaint, it does not argue in its response brief that these provisions are money-mandating.[1] Rather, as the court understands it, plaintiff's argument is that these

---

[1] Defendant suggests that the court should ignore plaintiff's reference to these various statutes because they were not mentioned or alluded to in plaintiff's complaint. *See* Def.'s Reply in Support of Motion To Dismiss, ECF Dkt 15, at 3-4, 6. As the court understands it, however, plaintiff in its response brief is not alleging violation of any of these statutory provisions, but is invoking these statutes only to demonstrate a degree of federal "control" over water resources that is sufficient to show that the federal government must exercise the common law trust duties referenced in plaintiff's complaint. However, if—contrary to the court's view—plaintiff does indeed intend to raise new claims by citing these statutes, those new claims constitute an improper attempt constructively to amend the complaint. The court would therefore not consider them. *See Insurance Co. of the West v. United States*, 100 Fed. Cl. 58, 63 (2011) (citing *Bisseur v. Indiana Univ. Bd. of Trs.*, 581 F.3d 599, 603 (7th Cir. 2009)).

A4

provisions show that "the actions of the United States have permeated the decisions about where and how to provide access to water on the Hopi Reservation," Pl.'s Response to Motion To Dismiss at 16, and that this "pervasive involvement in securing access to drinking water," *id.* at 17, "creates an enforceable obligation" on the part of defendant, *id.* at 19, to fulfill common law duty of a trustee to preserve the quality of the water, *id.* at 19-25 (citing *United States v. Mitchell (Mitchell II)*, 463 U.S. 206 (1983); *United States v. White Mountain Apache Tribe*, 537 U.S. 465 (2003); *Fort Mojave Indian Tribe v. United States*, 23 Cl. Ct. 417 (1991)). That duty, according to plaintiff, is money-mandating because, "[u]pon establishing the fiduciary obligations, 'it naturally flows that the Government should be liable in damages for breach of its fiduciary duties.'" Pl.'s Response to Motion To Dismiss at 27 (quoting *White Mountain*, 537 U.S. at 476).

## D. Defendant's Reply

In its reply, defendant argues that plaintiff's theory of the case runs afoul of *United States v. Jicarilla Apache Nation*, 131 S. Ct. 2313 (2011), because it asks the court to apply common law trust principles to infer a duty on the part of the federal government. Def.'s Reply in Support of Motion To Dismiss, ECF Dkt 15, at 1-3. Defendant also argues that plaintiff's argument, though different from the theory of the case plaintiff set forth in its complaint, still fails to identify an applicable trust duty requiring the federal government to deliver adequate drinking water to the Hopi Reservation, *id.* at 3-5, or to drill wells or construct water infrastructure on the Reservation, *id.* 6-13. For this reason, defendant argues that discovery to uncover evidence of federal "involvement" in constructing wells would be pointless—there being no money-mandating trust duty, federal involvement is irrelevant. *Id.* at 13.

The facts and arguments having been set forth, the court will now turn to the question before it: whether plaintiff has met the jurisdictional test for identifying a money-mandating trust duty.

## II. DISCUSSION

"A plaintiff bears the burden of establishing subject-matter jurisdiction by a preponderance of the evidence." *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1327 (Fed. Cir. 2010) (citing *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988)).

The basic test for identifying a money-mandating trust duty was set forth above, but it will be useful here to review some basic principles and explain that test in more detail, beginning with the doctrine of sovereign immunity. Under the doctrine of sovereign immunity, the United States cannot be sued without its consent. *United States v. Navajo Nation (Navajo II)*, 556 U.S. 287, 289 (2009); *Mitchell I*, 445 U.S. at 538. The Indian Tucker Act for tribal claimants unambiguously waives sovereign immunity, *Navajo II*, 556 U.S. at 290, by providing that the Court of Federal Claims shall have jurisdiction "of any claim against the United States . . . whenever such claim is one arising under the Constitution, laws or treaties of the United States, or Executive orders of the President, or is one which otherwise would be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe, band or group." 28 U.S.C. § 1505. The "otherwise would be cognizable" clause refers to the waiver of sovereign immunity found in the ordinary Tucker Act, *see Navajo II*, 556 U.S. at 290, which covers any claim "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or

- 4 -

upon any express or implied contract with the United States, or for liquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1).

However, these waivers of sovereign immunity do not "create any substantive right enforceable against the United States." *Mitchell I*, 445 U.S. at 538 (quoting *United States v. Testan*, 424 U.S. 392, 398 (1976)). Rather, that substantive enforceable right arises out of the precise nature of the United States' duties as trustee. *Id.*

Crucially, it is the precise trust duty, rather than the United States' status as trustee, that determines the substantive right. In *Mitchell I*, 445 U.S. 535 (1980), the court held that the existence of a "trust relationship" between the federal government and an Indian tribe is not enough to establish any particular trust duty. *Id.* at 549. Examining a statute closely, the court held that, despite the statute's reference to land being held "in trust," the federal government's "fiduciary obligations . . . as trustee are very narrow" and did not encompass all the duties of a private trustee with respect to trust property. *Id.* The Supreme Court has never deviated from this line of reasoning and has consistently defined trust duties by closely examining the statutes that impose them. *See Mitchell II*, 463 U.S. at 224 (holding that statutes and regulations "define the contours of the United States' fiduciary responsibilities"); *United States v. Navajo Nation (Navajo I)*, 537 U.S. 488, 506 (2003) (holding that, in determining the scope of trust responsibilities, "the analysis must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions"); *Navajo II*, 556 U.S. at 293-94, 301 (holding that the scope of trust duties is defined by applicable statutes and regulations); *Jicarilla*, 131 S. Ct. at 2323 (holding that "Congress may style its relations with the Indians a 'trust' without assuming all the fiduciary duties of a private trustee, creating a trust relationship that is 'limited' or 'bare' compare to a trust relationship between private parties at common law").

To be sure, while the federal government's trust duties are ultimately determined by Congress, trust language in a statute may implicitly evoke common law trust principles. *See White Mountain*, 537 U.S. at 474-76; *id.* at 480 (Ginsburg, J., joined by Breyer, J., concurring); *see also Cobel v. Norton*, 240 F.3d 1081, 1101 (D.C. Cir. 2001) (holding that the "interstices" produced by imprecise language of statutes may be "filled" by reference to common law trust principles); *Cohen's Handbook of Federal Indian Law* § 5.05[2], pg. 433 (2005 ed.) ("[T]rust cases arising from actual control of a resource may involve imprecise statutory language. Accordingly, [to] determine the extent of the government's duties, courts often rely on the general law of trusts, once it has been established that an actionable claim for breach of trust exists."). *White Mountain* is a primary example. There, the court confronted a statute that provided for certain land to be "held by the United States in trust for the White Mountain Apache Tribe, subject to the right of the Secretary of the Interior to use any part of the land and improvements for administrative or school purposes for as long as they are needed for the purpose." 537 U.S. at 469 (quoting Pub.L. 86-392, 74 Stat. 8). Focusing on the statute's use of the word trust in conjunction with the Secretary's authority to "use" the land, the Court held that the statute imposed a fiduciary duty on the part of the federal government to preserve the trust property. *Id.* at 474-76.

It is important to recognize that common law trust principles applied in *White Mountain* only because the statute in question used trust language in combination with conferring specific authority on the government. It stood to reason that, in exercising that authority, the government was bound by virtue of the word "trust" to exercise the common law duties of a trustee. As two of the justices in the five-justice majority emphasized in a separate concurrence, the holding of

*White Mountain* was based on the fact that the statute "expressly and without qualification employs a term of art ('trust') commonly understood to entail certain fiduciary obligations, and invests the United States with discretionary authority to make direct use of portions of the trust corpus." *Id.* at 480 (Ginsburg, J, joined by Breyer, J., concurring) (internal quotation marks and citations omitted). Thus, as the Court has since recognized, it is the statutory language itself that is ultimately determinative of the scope of the duties, although "common-law principles" may to some extent "inform [the court's] interpretation of [those] statutes." *Jicarilla*, 131 S. Ct. at 2325 (citing *White Mountain*, 537 U.S. at 475-76); *see also Navajo II*, 556 U.S. at 301.

In view of the foregoing, the Court has fashioned a two-part test for determining the existence of a substantive right enforceable in this court under the Indian Tucker Act, 28 U.S.C. § 1505, and the Tucker Act, 28 U.S.C. § 1491(a)(1). First, "the tribe 'must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties.'" *Navajo II*, 556 at 290 (quoting *Navajo I*, 537 U.S. at 506). The duty cannot be based on the general trust relationship existing between the United States and Indian tribes or on common law trust principles not tethered to any statute, but must arise out of a specific source of law of the kind cited in the Indian Tucker Act or Tucker Act. *Id.* at 301; *Navajo I*, 537 U.S. at 506; *see also Jicarilla*, 131 S. Ct. at 2323. Second, if such a source of law exists, it must be able to be "fairly interpreted as mandating compensation by the Federal Government for the damages sustained." *Mitchell II*, 463 U.S. at 216-17 (quoting *Testan*, 424 U.S. at 400). "*If* a plaintiff identifies such a prescription, and *if* that prescription bears the hallmarks of a 'conventional fiduciary relationship,' . . . *then* trust principles (including any such principles premised on 'control') could play a role in 'inferring that the trust obligation [is] enforceable by damages.'" *Navajo II*, 556 U.S. at 301 (quoting *White Mountain*, 537 U.S. at 473, 477) (emphases and alteration in original).

In seeking to ascertain whether plaintiff has cleared the first "hurdle," the court must begin where the *Navajo* cases instruct it to begin: "with 'specific rights-creating or duty-imposing statutory or regulatory prescriptions.'" *Id.* at 301 (quoting *Navajo I*, 537 U.S. at 506). Plaintiff argues that defendant's duty springs from the Executive Order of 1882 and the Act of 1958. Nothing in the text of either the Act of 1958 or the Executive Order of 1882 mentions any duty on the part of defendant to protect the quality of drinking water on the Reservation. The Executive Order of 1882 simply describes the land comprising the Reservation and orders that land to be "set apart for the use and occupancy of the Moqui and other such Indians as the Secretary of the Interior may see fit to settle thereon." The Act of 1958 provides that plaintiff's land is "to be held by the United States in trust for the Hopi Indians" and authorizes the Attorney General (as well as Hopi and Navajo tribes and individuals) "to commence or defend in the [district court] an action against each other any other tribe of Indians claiming any interest in or to the areas described in [the Executive Order of 1882] for the purpose of determining the rights and interests of said parties in and to said lands." 72 Stat. 493. But the Act of 1958 does not confer a duty to protect the water supply or, indeed, to manage water or other resources in any way.

Moreover, as *Mitchell I* made clear, the Act of 1958's use of the word "trust," by itself, is insufficient to support an inference that the statute imposes the common law duties of trustees. There, the Court had before it a statute that, like the Act of 1958, described Indian land as being held in "trust" by the federal government. That, however, was not enough to permit the inference that the federal government had a comprehensive duty to manage Indian resources.

A7

*Mitchell I*, 445 U.S. at 549. Nor is it enough here: a "bare trust," devoid of any particular duty to manage resources, does not require the federal government to exercise the common law duties of trustees. *See id.*

Plaintiff does not argue otherwise but instead urges that such a duty may be inferred from the trust relationship because of the high degree of federal "control," evidenced by various federal statutes, over plaintiff's drinking water. To reiterate: plaintiff does not allege in its complaint a violation of any of these statutes, and the court therefore does not read plaintiff to be asserting a violation of them in its response brief. Rather, plaintiff's point is that these statutes demonstration such a high degree of federal "control" over and "involvement" with plaintiff's water supply that one can infer, based on the common law trust principles cited in plaintiff's complaint, that the Executive Order of 1882 and the Act of 1958 should be interpreted to impose a duty on defendant to preserve the Hopi Reservation's water supply.

The argument fails. As the Supreme Court made clear in *Navajo II*, "The Federal Government's liability cannot be premised on control alone." 556 U.S. at 301. There, the Court rejected the argument that a specific fiduciary duty with respect to coal on the plaintiff's land could be inferred from the fact that a network of statutes and regulations gave the federal government "comprehensive control" over coal. *Id.* "Because the Tribe cannot identify a specific, applicable, trust-creating statute or regulation that the Government violated, we do not reach the question whether the trust duty was money mandating. Thus, neither the Government's 'control' over coal nor common-law trust principles matter." *Id.*

*Navajo II*'s holding that the federal government's fiduciary duties cannot be based on common law or control was reiterated recently in *Jicarilla*. That case concerned the common law exception to the attorney-client privilege requiring a trustee to disclose to a beneficiary attorney-client communications related to the exercise of fiduciary duties. The question was whether that exception applies to the general trust relationship between the United States and Indian tribes. *See Jicarilla*, 131 S. Ct. at 2318. The Court held that the exception does not apply because the federal government is unlike a private trustee in at least one important respect: the "trust" between the federal government and the Indians "is defined and governed by statutes rather than the common law," and therefore Congress "may style its relations with the Indians a 'trust' without assuming all the fiduciary duties of a private trustee." *Id.* at 2323. Therefore, a specific trust responsibility could not be based on the bare use of the word "trust," *id.*, or on the federal government's "managerial control," *id.* at 2325 n.5. Instead, "[t]he Government assumes Indian trust responsibilities only to the extent it *expressly* accepts those responsibilities by statute." *Id.* at 2325 (emphasis added).

*Navajo II* and *Jicarilla* accord with the whole underlying theory of Indian trust law set forth above. It is fundamental to that theory that the federal government's duties trustee are subject to the sovereign power of the United States and the "political" control of Congress. *Lone Wolf*, 187 U.S. at 565-66. In this respect, as *Jicarilla* explains, an Indian "trust" is not like a private trust.

As noted above, the Court has applied common law principles to Indian trusts where the language calls for it. *See White Mountain*, 537 U.S. at 475. But in *White Mountain*, the specific statutory provision at issue simultaneously used the word "trust" in connection with imparting to the federal government a right to "use" the land. *Id.* at 469. It was therefore inferred that the federal government, in using the land, was required to exercise the common law duties of a

A8

trustee using trust property. *Id.*; *see also id.* at 480 (Ginsburg, J, with Breyer, J., concurring). Here, the Act of 1958 does not confer on the federal government comparable authority or, indeed, any kind of authority to use or manage the land. The Court has never suggested that a plaintiff can mix and match the trust language from one statute with various duties from entirely unrelated statutes to infer common law duties—and countenancing such a maneuver would severely undermine the principle that common law duties of trustees are applicable to the federal government only to the extent the federal government "expressly accepts" them. *Jicarilla*, 131 S. Ct. at 2325.

Before disposing of this matter, the court will briefly address plaintiff's request for jurisdictional discovery. Jurisdictional discovery is appropriate where jurisdictional facts are in dispute. *Samish Indian Nation v. United States*, 2006 WL 5629542, at *4 (Fed. Cl. July 21, 2006); *E. Trans-Waste of Md., Inc. v. United States*, 27 Fed. Cl. 146, 148, n.1 (1992). The disputed jurisdictional facts, according to plaintiff, concern the degree of federal control over plaintiff's water resources. But for the reasons explained above, those facts are irrelevant. No degree of federal control, even a very high one, can satisfy the first step in the jurisdictional test: identifying a specific trust duty that the federal government is alleged to have violated. *Navajo II*, 556 U.S. at 301. Because plaintiff cannot satisfy this preliminary step, discovery is unwarranted.

In short, this case is simple and straightforward. Neither the Executive Order of 1882 nor the Act of 1958 expressly imposes a duty on defendant to protect the quality of plaintiff's water supply. Nor can such a duty under these sources of law be inferred from the Act of 1958's use of the word "trust" or from the degree of "control" established by various other statutes. *Jicarilla*, 131 S. Ct. at 2323, 2325 n.5; *Navajo II*, 556 U.S. at 301. Because plaintiff has failed to clear the first "hurdle" in establishing this court's jurisdiction, the court need not consider whether any provision plaintiff cites can "fairly be interpreted" as mandating compensation. *See Navajo II*, 556 U.S. at 290, 301.

The court is not unmindful of the sometimes tragic relationship between the federal government and the various Indian tribes. And it may be that plaintiff's argument that the trust relationship between the United States and its various Indian tribes should be construed broadly given that tragic relationship and the at times almost complete economic dependency that exists in this relationship. Nonetheless, this court is bound by the law even if the result is not to the court's liking.

### III. CONCLUSION

For the foregoing reasons, defendant's MOTION to dismiss for lack of subject-matter jurisdiction is GRANTED. The Clerk is directed to take the necessary steps to dismiss this matter.

**IT IS SO ORDERED.**

*s/ Lawrence J. Block*

Lawrence J. Block
Judge

A9